**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**AT PIKEVILLE**

**CIVIL CASE NO. 22-64-DLB-CJS**

**CITY OF PIKEVILLE**                                                                    **PLAINTIFF**


**v.**                              **MEMORANDUM OPINION AND ORDER**


**CEBRIDGE ACQUISITION, LLC, et al.**                                   **DEFENDANTS**

**\*\*\* \*\*\* \*\*\* \*\*\***

This matter is before the Court upon the Motion to Dismiss filed by Defendants Cebridge Acquisition, LLC ("Cebridge"), Cequel III Communications II, LLC, d/b/a Suddenlink Communications ("Cequel"), and Altice USA ("Altice").  (Doc. # 38).   Plaintiff City of Pikeville (the "City") responded (Doc. # 39), Defendants replied (Doc. # 40), and the motion is now ripe for review.  For the reasons stated herein, Defendants' Motion to Dismiss (Doc. # 38) is **granted**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In 2009, the City of Pikeville, Kentucky, granted a ten-year non-exclusive franchise to Cequel for the provision of cable television services within the City.  (Doc. # 36 ¶ 8).  Approximately six years later, Altice merged with Cequel in a complex arrangement that saw Altice "acquire seventy percent of the issued and outstanding equity of Cequel Corporation."  (*Id*. ¶ 10).  The City alleges that in the wake of this merger, the quality of services Cequel provided to the City's residents declined precipitously, prompting the City to call a hearing in June 2020 before its Board of Commissioners ("the Board") to determine if Cequel was still operating in compliance with the franchise.  (*Id*. ¶ 23).

1

At the hearing, Cequel, represented by Altice, denied all allegations of failure to comply with the franchise. (*Id.* ¶ 24). The Board heard evidence from several sources, including communication between the City, Cequel's representatives, and a survey of City residents asking about their satisfaction with Cequel's service. (*Id.* ¶ 27; Doc. # 1-7 at 8-10). At the end of the hearing, the Board found that Cequel had not complied with the terms of the franchise agreement and ordered them to pay liquidated damages. (Doc. # 36 ¶ 28).

Cequel never paid. In response, the City filed this diversity action seeking to enforce the Board's determination. They sued Cequel as the franchisee, Altice, as Cequel's parent company, and Cebridge Acquisition, a company of unknown relation to the suit. The City requested a declaratory judgment that Cequel breached the franchise and owes liquidated damages to the City, requested an injunction against future violations of the franchise, asserted a claim of breach of franchise, and demanded indemnification under the terms of the franchise. (*Id.* ¶¶ 30-45).

The Defendants filed this Motion to Dismiss asserting that this Court lacks personal jurisdiction over Altice and that the City failed to state a claim against all Defendants. (Doc. # 38). Because the City failed to sufficiently allege the citizenship of two Defendant LLCs, Cebridge and Cequel, Magistrate Judge Candace Smith held a telephonic hearing on the matter and directed the City to file an Amended Complaint correcting the deficiency. (Doc. # 35). The City did so, and Judge Smith then directed the clerk to re-docket the Motion to Dismiss, Response, and Reply as relating to the Amended Complaint. (Doc. # 37). The clerk having done so, the motions are now ripe for review.

## II.    ANALYSIS

Defendants argue that this Court lacks jurisdiction over Altice on any claim because it "has no employees, no accounts, and no property in Kentucky, and [] does not market goods or services to residents here."  (Doc. # 38 at 1).  They also argue that the City has failed to state a claim against any Defendant because it has not alleged sufficient facts to lay out a prima facie case of Defendants' breach.  (*Id*.).  In response, the City chastises Defendants for attempting to "appeal" the Board's decision regarding their alleged breach of the franchise and asks this Court to simply enforce the Board's determination, no questions asked.  (Doc. # 39 at 3-4).  The City also argues that the Court has jurisdiction over Altice because Altice's business strategy caused Cequel to breach the franchise and violate the ordinance, and its appearance before the Board in the underlying proceedings constituted waiver of personal jurisdiction here.  (*Id*. at 5-8).  On the Rule 12(b)(6) motion, the City argues that they need not allege facts showing breach because, again, the issue of breach was already conclusively established by the City's internal proceedings.  (*Id*. at 8-11).  Therefore, in its opinion, attachment of the Board's decision to the Complaint as an exhibit is sufficient to end the matter.

### A.    Personal Jurisdiction over Altice

This Court lacks personal jurisdiction over Defendant Altice.[1]  At the pleading stage, the Plaintiff carries the burden of laying out a prima facie case for jurisdiction.  *See Malone v. Stanley Black & Decker, Inc.,* 965 F.3d 499, 502 (6th Cir. 2020) ("Whether

---

[1]    Although the issue is not argued, the Court also believes it lacks personal jurisdiction over Cebridge.  The Amended Complaint is entirely silent as to what conduct brings Cebridge under this Court's jurisdiction.  In fact, Cebridge is only correctly mentioned three times—in the caption, summary, and statement of citizenship—and incorrectly as "Cebridge Connections, Inc." twice. (*See* Doc. # 36 at 2).  Nevertheless, the Court will address the claims against Cebridge as they were argued: under a Rule 12(b)(6) standard for failure to state a claim.

discovery is permitted or not, the initial burden is on the plaintiff to make at least a prima facie showing of jurisdiction."). Altice is a Delaware corporation with its principal place of business in New York. (Doc. # 1 at 2). It has no employees or accounts in Kentucky and does not lease or own property here or market goods or services directly to the Commonwealth. (Doc. # 38-2 at 2). However, the City alleges that Kentucky's long arm statute and the limits of due process encompass Altice's conduct, and allow the exercise of specific jurisdiction based on Altice's business strategy and appearance in the Board proceedings. The Court disagrees and holds that the City has failed to bear its burden.

When the Court decides a Rule 12(b)(2) motion to dismiss without calling an evidentiary hearing, the plaintiff must simply make a prima facie showing of personal jurisdiction. *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008); *see also Neogen Corp. v. Neo Gen Screening, Inc*., 282 F.3d 883, 887 (6th Cir. 2002). The plaintiff "can meet this burden by 'establishing with reasonable particularity sufficient contacts between [Altice] and the forum state to support jurisdiction.'" *Neogen*, 282 F.3d at 887 (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). All the evidence is then viewed in the light most favorable to the plaintiff. *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991); *see also Neogen*, 282 F.3d at 887 ("[T]his court will not consider facts proffered by the defendant that conflict with those offered by the plaintiff.").

But if the defendant, as here, submits "a properly supported motion for dismissal," then the Plaintiff must affirmatively support its contentions "by affidavit or otherwise, set[ting] forth specific facts showing that the court has jurisdiction." *Theunissen*, 935 F.2d at 1458; *see also Parker v. Winwood*, 938 F.3d 833, 839–40 (6th Cir. 2019); *Miller v. AXA*

4

*Winterthur Ins. Co.*, 694 F.3d 675, 678 (6th Cir. 2012); *Carrier Corp. v. Outokumpu Oyi*, 673 F.3d 430, 449 (6th Cir. 2012).  If the plaintiff fails to put forth sufficient specific facts in opposition to the Motion, then the court will dismiss for lack of personal jurisdiction unless the complaint itself sufficiently rebuts defendant's contentions.  *Babcock Power, Inc. v. Sterling Grp., LP.*, No. 3:16-cv-789-CRS, 2017 WL 3161624, at *2 (W.D. Ky. July 25, 2017); *see also Theunissen*, 935 F.2d at 1459 ("[T]he court disposing of a 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal.").

This Court, sitting in diversity, looks to Kentucky law to determine its personal jurisdiction, subject to the Constitution's due process requirements.  *Air Prods. & Controls, Inc. v. Safetech, Int'l*, Inc., 503 F.3d 544, 550 (6th Cir. 2007).  Because, unlike most states, Kentucky's long-arm statute does not reach the outer limits of due process, analysis of personal jurisdiction under Kentucky law is a two-step process.  *Newberry v. Silverman*, 789 F.3d 636, 641 (6th Cir. 2015) (citing *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 57 (Ky. 2011)).  "First, a court must look to see if the cause of action arises from the type of conduct or activity that is enumerated in the [Kentucky long-arm] statute itself."  *Id*.  If there is jurisdiction under the long-arm statute, "then the court must assess whether 'exercising personal jurisdiction over the non-resident defendant offends his federal due process rights.'"  *Id*.

### 1.   *Kentucky's Long-Arm Statute*

The Kentucky long-arm statute provides nine categories of conduct which may subject a defendant to personal jurisdiction in a Kentucky court.  Ky. Rev. Stat. § 454.210. A person is subject to the Kentucky long-arm statute whether he "acts directly or by an agent." Ky. Rev. Stat. § 454.210(2)(a). The plaintiff's claims must also "arise from" the

enumerated conduct in order for personal jurisdiction to lie. *Id*. at § 454.210(2)(b). "A claim 'arises from' certain conduct when there is a 'reasonable and direct nexus' between the conduct causing injury and the defendant's activities in the state." *Holbrook v. Mazda Motor Corp*., 6:17-cv-244-DCR, 2018 WL 1571905, at *2 (E.D. Ky. Mar. 30, 2018) (citing *Caesars Riverboat Casino*, 336 S.W.3d at 57). Courts "ultimately have to depend upon a common sense analysis, giving the benefit of the doubt in favor of jurisdiction," when determining whether the plaintiff's claims arise from the defendant's actions. *Caesars Riverboat Casino*, 336 S.W.3d at 59.

The first category of conduct enumerated in the long-arm statute allows the "exercise [of] personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's . . . [t]ransacting any business in this Commonwealth." Ky. Rev. Stat. § 454.210(2)(a)(1). There is no agreed-upon interpretation of what it means to "transact any business" in Kentucky under the long-arm statute. *See Hall v. Rag-O-Rama, LLC*, 359 F. Supp. 3d 499, 505–06 (E.D. Ky. Jan. 8, 2019) (collecting cases). But all courts have recognized that the plain text of the long-arm statute itself first requires two things: a "transaction" and that such transaction be itself "business in this Commonwealth." Ky. Rev. Stat. § 454.210(2)(a)(1). In fact, in *Hall*, where this Court held that sending emails to the plaintiff within Kentucky established personal jurisdiction, those emails were themselves part of the negotiation and execution of a business contract with the plaintiff. *Hall*, 359 F. Supp. 3d at 506. The Court cited two cases, *Power Invs., LLC v. Becker*, No. CV 5:18-466-DCR, 2018 WL 4390722 (E.D. Ky. Sept. 14, 2018), rev'd on other grounds in Power Invs., LLC v. SL EC, LLC, 927 F.3d 914 (6th Cir. 2019) and *Eat More Wings, LLC v. Home Mkt. Foods, Inc.*, 282 F. Supp. 3d 965 (E.D. Ky. 2017), both

of which relied on similar facts—emails negotiating a contract between the plaintiff and defendant. *Id*. Only when a business transaction has been proven does the "any" analysis come into play. It is not enough that *something* happened in Kentucky. The action must be a transaction of business.

### 2.    *Altice's Business Contacts in Kentucky*

Here, the City claims that Altice deliberately targeted Kentucky and "transacted business" here because of two facts: (1) its business strategy as majority owner of Cequel, and (2) its appearance on behalf of Cequel at the Board hearing. (Doc. # 39 at 5-8). The City alleges that Altice purchased Cequel as part of a broader strategy of "locating areas like Pikeville without serious competitive alternatives" and then rolling out a "predatory formula of slashing costs and service and raising prices without serious repercussion." (*Id*. at 6). In the Complaint, they put forward a press release announcing the merger and stating that Cequel "will benefit from the operational expertise, scale and investment support . . . at the core of the Altice business model." (Doc. # 36 ¶ 11). Shortly thereafter, ING stated that Altice was aiming for $215 million in savings at Cequel (known publicly as Suddenlink), and *Reuters* reported that Altice expected to "apply its usual formula at [Cequel]." (*Id*. ¶ 17). After this merger, the City alleges, the quality of Cequel's overall services began to decline. According to an American Customer Satisfaction Index Telecommunications Study evaluation, Cequel ranked last nationwide in customer satisfaction. (*Id*. ¶ 19). The City also points to Altice's Better Business Bureau page and its many negative reviews. (*Id*. ¶¶ 20-21). All these are national statistics.

At this point, the City sent a letter to Altice complaining of Cequel's alleged failures to comply with the franchise. (*Id*. ¶ 23). Altice responded and continued to appear in the

administrative process on behalf of Cequel, its subsidiary.  (Doc. # 39 at 7-8).  Ultimately, when the City determined that Cequel had violated the franchise, it cited as proof an internal survey conducted by the City that showed significant customer dissatisfaction with Cequel's service.  (Doc. # 1-7 at 8-11).  The City believes that this evidence shows that (1) Altice implemented a business strategy of cutting costs and maximizing profits by cutting services in vulnerable areas, (2) this strategy was applied not just at Cequel generally, but in the City of Pikeville specifically, and (3) the strategy had the effect of reducing Cequel's service below the minimum required by the franchise.

This argument fails because there is no "reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm jurisdiction." *Caesar's Riverboat Casino*, 336 S.W.3d at 59.  Even taking the allegations of Altice's "predatory" practices at face value, as required, the City has alleged no connection between Kentucky and Altice's alleged business strategy other than it's mere existence and Cequel's alleged failure to maintain the level of service required by the franchise.  The Court is left to imagine the connection between the strategy and the breach, at least as it relates to Kentucky.  Ultimately, the City's evidence is just news articles, with no concrete allegation that such conduct happened in Kentucky, much less that it affected Cequel's performance under the franchise.

The Complaint therefore lacks any allegation that Altice "transact[ed] any business in the Commonwealth."  Ky. Rev. Stat. § 454.210(2)(a)(1).  The City emphasizes the use of the word "any" in the statute, claiming that this is a broad term and that any action by Altice would suffice to bring it within the statute.  (*See* Doc. # 39 at 6-8).  It is true that "any" is a broad word; that much has been pointed out by prior courts.  *See Eat More*

*Wings*, 282 F. Supp. 3d at 969-70.  But it is not the only word in the statute.  As discussed above, there must be more than a mere action—it must be a *transaction of business*.  *See* Ky. Rev. Stat. § 454.210(2)(a)(1).  As that term is commonly used by courts, it requires the sale of—or preparation to sell—goods or services to the end user.  *See Childress Cattle, LLC v. Cain*, No. 3:17-cv-388-JHM, 2017 WL 3446182, at *3 (W.D. Ky. Aug. 10, 2017) (collecting cases); *Gentry v. Mead*, No. CV 16-100-DLB-CJS, 2016 WL 6871252, at *3 (E.D. Ky. Nov. 21, 2016) (looking for "a course of direct, affirmative actions within a forum that result in or solicit a business transaction.") (quotations omitted).  While it is theoretically *possible* that Altice's business strategy affected Cequel's performance under the franchise, the City has alleged no facts to reasonably establish that, and even if it did, it has not shown that those actions constituted the transaction of business by Altice itself within Kentucky.

In a last-ditch attempt to find personal jurisdiction, the City argues that the fact that Altice sent two letters to the City on their own letterhead shows that it "effectively presented itself as the franchisee."  (Doc. # 39 at 5).  This argument almost does not warrant a response, and Defendants' Reply brief ably dispatches it.  (See Doc. # 40 at 3). There are two reasons why it fails.  First, the letters have nothing to do with the alleged breaches of the franchise agreement or Altice's business strategy discussed above.  As Defendants correctly pointed out, this Court may only exercise jurisdiction "when a plaintiff asserts a claim arising from acts" in the long-arm statute.  (*Id.*).  Second, these letters were a response to an enforcement action *by the Plaintiff*.  If this Court were to hold that a non-merits response to litigation or administrative enforcement created sufficient contacts with the forum to authorize this Court's exercise of personal jurisdiction, then

parties could create personal jurisdiction over anyone by simply suing them, and the entire doctrine of personal jurisdiction would become a farce.

### 3.    *Waiver of Personal Jurisdiction*

Finally, the City argues that Altice consented to this Court's jurisdiction by appearing at the Board hearing.  (Doc. # 39 at 7).  As authority, they cite two Third Circuit Court of Appeals cases holding that "a party is deemed to have consented to personal jurisdiction if the party actually litigates the underlying merits or demonstrates a willingness to engage in extensive litigation in the forum."  *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 15 F.3d 1230, 1236 (3d Cir. 1994).  But just as their argument concerning Kentucky's long-arm statute, this interpretation ignores key words.   To consent to personal jurisdiction, the party must "engage in extensive litigation *in the forum*."  *Id*. (emphasis added).  This misinterpretation highlights a recurring conceptual error in the City's briefing: this Court is a distinct forum with its own rules, procedures, and jurisdictional limits.   On many issues it is simply not relevant what happened in another proceeding in another forum, whether it is an argument that appearing before the Board waived personal jurisdiction, or an argument that because the City's Board adjudged the matter, this Court cannot come to its own conclusion, or is bound to simply rubber-stamp that decision.  Personal jurisdiction addresses a predicate question: may this Court hear this case at all?  The answer to that question is independent of any actions in other forums and entirely independent of the merits.

In the end, the City has failed to make a prima facie case that this Court may exercise personal jurisdiction over Altice, whether by way of its business strategies, correspondence in the Commonwealth, or consent.   Therefore, this Court is without

personal jurisdiction over Altice and all claims against them will be **dismissed**.

### B.    Rule 12(b)(6) Dismissal

The Federal Rules of Civil Procedure require a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  This "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (quotations omitted).  The claimant must put forward enough facts that the court could reasonably infer "that the defendant is liable for the misconduct alleged." *Id*.

Defendants argue that the City has failed to state a claim against all three Defendants because it has failed to allege sufficient facts to show that any of them breached the franchise.  (Doc. # 38 at 5).  Specifically, Defendants argue that Altice and Cebridge are not parties to the franchise and therefore could not have breached, and that the Complaint fails to allege the elements of breach against Cequel.  (*Id*).  The City makes two arguments in response: first, it recycles its claims that Altice's business strategy constituted breach of the franchise, and second, that this is merely an action in federal court to enforce its prior adjudication of Defendants' breach and it therefore need not plead those elements.  (Doc. # 39 at 8-11).  For their part, the Defendants first argue that Kentucky law clearly insulates parent corporations and their subsidiaries from the

liabilities incurred by the other, and therefore Altice and Cebridge cannot be liable for any alleged breach by Cequel.  (Doc. # 40 at 5-7).  Second, they argue that the City's Complaint clearly requests relief beyond merely enforcing the Board's adjudication, and that even if it were an enforcement action, the franchise agreement and the Board's determination include no standards this Court can use to enter judgment.  (*Id*. at 9-10).  And finally, they argue that even if this is a "collection action," the City does not have a final judgment to enforce because the appeals period has not yet run.  (*Id*. at 9).  The Court agrees with the Defendants' arguments.  Only Cequel signed the franchise with the City, and Kentucky law quite clearly prohibits holding Cequel's parent company, Altice, liable for any breach of that franchise.  And the City's complaint alleges three causes of action that require this Court to come to its own conclusion on Cequel's breach, which it cannot do on the pleadings or based on the largely standardless franchise agreement.  All claims against Altice, Cebridge, and Cequel will therefore be **dismissed**.

### 1.   *The Process for Appealing the City's Adjudication*

The parties fundamentally disagree on the nature of this action.  The City claims that this is merely an enforcement action and "the only issue for this Court to determine is how much money Defendants need to pay."  (Doc. # 39 at 2).  They further rebuke the Defendants for seeking to "appeal" the City's Resolution by filing this Motion to Dismiss.  (*Id*. at 4, 9).  The Defendants contend that (1) they still possess an unexercised right to appeal the Board's decision within the Kentucky court system, and that (2) the City is attempting to recharacterize its Complaint in contradiction of its plain terms.  (Doc. # 40 at 8).  As will be discussed at Section II.B.3 below, Defendants are correct that the Complaint requests three distinct remedies, all of which require this Court to

independently evaluate breach.  Therefore, the City's argument that they are exempt from the pleading standard because they already decided that Defendants breached is unavailing.  Additionally, the argument that any defense of this action is an "appeal" by Defendants is facially ridiculous and will not be addressed other than to say that by definition, the Defendants are playing defense and cannot possibly be bringing an appeal. It is Plaintiffs who haled Defendants into this Court, not the other way around, and Defendants are entirely within their rights to contest Plaintiff's choice of forum, as they have done.  The more interesting question is whether the City even possesses a final judgment enforceable by this Court.

As all parties acknowledge, the franchise "provided a right to appeal the Board's decision" and the Defendants have yet to exercise that right.  (Docs. # 39 at 3 and 40 at 9).  However, the franchise does not set forth a time limit for when such an appeal must be brought or even designate a proper forum, a fact highlighted by the Defendants.  (Doc. # 40 at 9).  The City asks this Court to step into this vacuum and impose a thirty-day deadline of its own making.  (Doc. # 39 at 4).  The Defendants urge the Court to stick to the plain text of the franchise and not adopt its own deadline.  (Doc. # 40 at 9-10).

It certainly appears on its face that the franchise's description of the appellate process is incomplete at best, and unworkable at worst.  The City essentially asks this Court to rectify errors by elected representatives at various levels of local and state government, and to do so based on its own opinion of what would be fair for the parties. But federal courts operate in narrow bands of jurisdiction conferred by statute and the Constitution and are not free to impose their own policy judgments on parties before them, much less upon the administrative workings of independent sovereigns.  In fact, federal

courts will often abstain entirely from hearing a case that might necessitate federal intrusion into a complex state regulatory scheme. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[F]ederal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (quotations omitted)); *see also Hawks v. Hamill*, 288 U.S. 52, 60 (1933) ("Caution and reluctance there must be in any case where there is the threat of opposition, in respect of local controversies, between state and federal courts. . . . [t]here must be reluctance even greater when the rights are strictly local; jurisdiction having no other basis than the accidents of residence."); *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 423 (6th Cir. 2007) ("The fundamental concern in *Burford* is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution."). The relationship between the state and federal systems—and even more so the relationship between state and federal courts—depends on principles of federalism and comity. *See Younger v. Harris*, 401 U.S. 37, 44 (1971) (discussing "the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments."). Without these, the essential character of our Republic is lost, and this Court becomes a free-wheeling tribunal, ostensibly empowered to supplant the role of the people's representatives. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (explaining that foundational doctrines such as Article III standing exist to "prevent the judicial process from being used to usurp the powers of the political branches.").

14

Such an arrangement could not stand.  It is clear that Cequel possesses some measure of appellate rights under the franchise, and that they have not exercised those rights.  But it is equally clear that as long as some appellate process remains available, it is questionable whether the City has any final judgment to present to this Court for enforcement.  Because this Court is unwilling to impose its own will on Kentucky's system for supplying municipal services by writing into the statute its own deadline for Cequel's appeal, there is no final decision to enforce.  So, even if, as the City contends, the Complaint is simply an enforcement action, it does not belong here.

### 2. *Altice and Cebridge are not parties to the franchise*

Even if the Board's determination is enforceable, the City has failed to state a claim against the Defendants.  As explained earlier, the City sued three parties: Cequel, the franchisee, Altice, Cequel's parent company, and Cebridge Acquisition, a Delaware LLC of unknown relevance to this case.  As to Altice and Cebridge, the Defendants argue that because they are not parties to the City's franchise, they cannot be held liable for any breach by Cequel, the real party.  (Doc. # 38 at 6-8).  The City contends that Altice's acquisition of Cequel and its involvement in the Board proceedings suffice to make them potentially liable for Cequel's alleged breach.  (Doc. # 39 at 10-11).  In their Reply, the Defendants again point to Kentucky law insulating parent corporations from liability for the torts of their subsidiaries, even if they exert a modicum of control over the actions of the subsidiary.  (Doc. # 40 at 11).  The Court agrees with the Defendants and will **dismiss** the claims against Altice and Cebridge[2] for failure to state a claim.

---

[2]     The City makes no attempt to justify suing Cebridge.  The Complaint lacks allegations against Cebridge and the City puts forward none in its Response to the Motion to Dismiss.  Therefore, the Court easily dismisses the claims against Cebridge; there simply are none.

Kentucky law is clear that "separate corporate interests, including subsidiaries and affiliates . . . are separate legal entities and must be recognized and treated as such unless there is some reason to pierce the corporate veil."[3]  *Hazard Coal Corp. v. Kentucky W. Virginia Gas Co.*, 311 F.3d 733, 739 (6th Cir. 2002); *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 661 (6th Cir. 1979) ("Owners may elect to divide their business into parent and subsidiary corporations entitled to respect as separate legal entities in the absence of improper purposes.").  This understanding is foundational to corporate law.  In fact, if this Court were to find that the mere existence of a parent company was sufficient to make that parent liable for the torts of the subsidiary, it would gut corporate law as we know it and render most corporate structures irrelevant.  Business constructs like limited liability corporations (LLCs) exist to limit liability—it's in the name, after all—by creating separate legal entities to contain liability within an organization, or between shareholders in their individual and official capacities.  While the Court readily recognizes that such structures can in many ways be legal fictions, they are nevertheless an important part of commerce in this country, and it is not this Court's role to question them.

In this case, Altice owns at least 70% of Cequel's "issued and outstanding equity." (Doc. # 36 ¶ 10).  And although Altice's ownership undoubtedly affects Cequel's day-to-day business operations—after all, parent corporations rarely acquire smaller companies merely to let them proceed with business as usual—Cequel enters its own contracts and conducts its own business, including soliciting, obtaining, and servicing this franchise with the City of Pikeville.  The franchise at issue, Pikeville Ordinance No. 0-2009-022, is

---

[3]      The City explicitly disclaims any attempt to "pierce the corporate veil" here, stating that this mechanism would only become relevant "if it develops that Altice's subsidiaries are undercapitalized."  (Doc. # 39 at 8).

explicitly made with only Cequel III Communications II, LLC d/b/a/ Suddenlink Communications. (Doc. # 1-2 at 45). The Board's Resolution "finding that Cequel III, Communications II LLC has failed to comply with certain provisions of Ordinance # 0-2009-022" lists only Cequel as the franchisee, and even characterizes the franchise as "between the City and Cequel III, Communications II LLC." (Doc. # 1-7 at 1). The only mention of Altice in the proceedings is contained in the City's formal letters to Cequel and Altice notifying them of the Board proceedings. (*See* Doc. # 1-3). There, the City notifies "Altice USA (dba "Suddenlink") in writing of Suddenlink's failures to comply with the certain (sic) provisions of the City's cable franchise ordinance." (*Id*.). Interestingly, as far as the Court can tell, this characterization of Altice as using the d/b/a name "Suddenlink" is incorrect, and that name properly belongs to Cequel. Nevertheless, it appears that Altice was notified of the hearing because Cequel had, as required by the franchise, notified the City that Altice had taken ownership of Cequel. (*See* Doc. # 38-1). In that letter, Altice notified the City on behalf of Cequel and noted that "Suddenlink still holds the cable service franchise in the City." (*Id*.). All the facts alleged so far show conclusively that the franchise agreement was made with Cequel only, even though Altice retains ownership of a majority of Cequel's equity as a formal business matter. None of these arrangements make Altice potentially liable for breach of the franchise.

The City makes no allegation that Cequel's business structure exists to circumvent laws or for any other unlawful purpose; instead, it argues that the bare fact that this business structure exists is sufficient to make Altice liable under the franchise. This Court disagrees and will therefore dismiss the claims against Altice on Rule 12(b)(6) grounds, in addition to the personal jurisdiction grounds discussed above.

### 3.     *The City fails to state a claim against Cequel*

Finally, the Defendants argue that the City also fails to state a claim against the franchisee, Cequel, because it does not allege the elements of breach necessary to resolve each of the three counts in the Complaint.  (Doc. # 38 at 8-11).  In response, the City argues again that breach has already been adjudicated by the City itself, and it need not be pled here.  (Doc. # 39 at 8-11).  As discussed above, it is doubtful that the City has a final and unappealable decision to enforce in this forum.  *See* supra, Section II.B.1.  But even under the Rule 8 pleading standards, the Complaint against Cequel fails.  The Court agrees with Cequel and finds that the City has failed to allege breach, a necessary element of their claims.  The remainder of the Complaint is **dismissed**.

Count 1 of the Complaint requests a declaratory judgment and an injunction from this Court declaring that "an actual controversy exists between" the parties, that "due to [Cequel's] violations of the ordinance, [it] must pay Plaintiff liquidated damages," and enjoining "continued violations of the ordinance."  (Doc. # 36 ¶¶ 30-34).  The Court does not believe that this request can adequately be addressed without evaluating the underlying breach.  As discussed above, the City's own administrative decision does not automatically get enforced in this forum, and indeed there would be serious fairness issues in allowing a party to "declare" its adversary legally at fault and then harness the power of the federal courts to enforce that declaration.  As the Defendants aptly stated, "[n]o matter how much Pikeville wants to turn its City Commission into judge and jury over this case, it still is not a court."  (Doc. # 40 at 4).

Additionally, the five factors the Sixth Circuit uses to evaluate the propriety of declaratory judgment counsel against exercising that power here.  Those factors are "(1)

whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective." *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 813 (6th Cir. 2004). The third factor, whether the parties are seeking to create a res judicata issue, applies here. The City brings this action solely to obtain a legally enforceable judgment which it cannot get in state court as long as the Defendants decline to exercise their amorphous right to appeal and thereby risk an unfavorable judicial decision. That puts the Court in the position of helping one party—the City—rectify its poor drafting of the franchise.

All that assumes that the City's reading of its own Complaint is correct, and it is indeed simply an enforcement action. But it is not. To determine whether Cequel violated the franchise, that they owe liquidated damages, and that it is enjoined from further violations, the Court must find and define what a "violation" is. And that is not possible without digging into the franchise agreement, its requirements, and Cequel's conduct. On the facts alleged in the Complaint and in the City's responsive briefing, the Court cannot do that. As the Defendants point out, the City has not "reference[d] a single provision of the franchise that has been violated," outlined "what the Ordinance requires, or [] how any conduct violates those requirements." (Doc. # 38 at 9). The Complaint is completely silent on these points and relies instead on the attached decision by the Board that held Cequel violated the franchise. (Doc. # 39 at 8-11). But that is not the standard. The City

19

must draft a Complaint that "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (quotations omitted). Yes, they may rely on attachments and exhibits to help bear that burden, but the Complaint itself must separately present the allegations. *See, e.g.*, *McKissick v. Deal*, No. 5:14-CV-72 MTT, 2014 WL 1690436, at *1 (M.D. Ga. Apr. 29, 2014) ("[I]t is [Plaintiff's] duty to meet the pleading requirements of Fed. R. Civ. P. 8 by filing a clear and concise complaint and [] this duty cannot be met by simply attaching numerous exhibits to his complaint in lieu of making direct allegations."). To hold otherwise would require the Defendants and the Court to guess at the City's allegations based on the exhibits. That is not the Rule 8 standard.

In the end, the City has failed to allege breach of the franchise with sufficient specificity to make a plausible claim for relief. This Court simply cannot grant the relief requested in Count 1 without an allegation of breach. However, even if the Board's determination is entitled to deference, it is not clear that the City has an enforceable judgment, fairness considerations counsel against treating as conclusive the judgment of one party in the litigation, and the Sixth Circuit's factors for considering declaratory judgment, all counsel against that remedy here.

Count 2 of the Complaint alleges a garden-variety cause of action for breach of the franchise. (Doc. # 36 ¶¶ 35-40). A franchise is a form of contract, and "[t]o prove a breach of contract, the complainant must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Duke's Roofing & Exterior Constr., LLC v. Lexis Coatings, LLC*, No. 5:16-CV-432-REW, 2018 WL 4169045, at *6 (E.D. Ky. Aug. 30, 2018) (quoting *Metro Louisville / Jefferson Cnty. Gov't*

*v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)).  Here, the City has shown the existence of a contract, but as discussed above, has failed to show breach.

As with count 1, allegation of breach is necessary to resolve count 2, particularly paragraph 38 of the Complaint, which alleges that "[Cequel] failed to perform its obligations to Plaintiff."  (Doc. # 36 ¶ 38).  But the rest of the Complaint, and the City's Response on the Motion to Dismiss, include no further facts showing what provisions of the franchise were breached.  For example, the City alleges that Cequel failed to maintain the levels of service required by the franchise, but points to very few objective criteria for Cequel to use in measuring their service, or for the Court to use in measuring deficiency. (*See* Doc. # 1-2).  The franchise requires Cequel to maintain the cable systems "in good condition" and requires ten categories of content be made available, but does not set forth any standards for evaluating quality beyond requiring Cequel "to maintain the technical standards and quality set forth in th[e] Ordinance."  (*Id*. at 26).  This lack of standards is highlighted by two aspects of the Board's resolution finding Cequel in breach: (1) the City's determination that Cequel failed to provide service is based on a customer satisfaction poll conducted by the City,[4] and (2) the fact that the majority of the resolution faults Cequel for failing to comply with insurance coverage standards or relies on statistics unrelated to the actual franchise standards.[5]  (Doc. # 1-7).  Without clear standards for

---

[4]    While customer satisfaction is certainly relevant to whether a provider is doing a good job, its connection to breach is tenuous unless the franchise specifically makes survey results the measure of success.  After all, if customer satisfaction determined whether a provider violated its contracts, nearly every utility company in the country would be doomed.

[5]    For example, the resolution states that the franchise requires that "the customer will receive a busy signal less than 3% of the time."  (Doc. # 1-2 at 27).  However, according to the City, "[t]he Survey reports that almost 29% of Suddenlink customers in the City have experienced a busy signal," a statistic that has no bearing on whether individual customers experienced a busy signal more than 3% of the time they used their cable service.  (Doc. # 1-7 at 10).

evaluating Cequel's performance, let alone sufficient allegations of breach, this Court cannot find a "claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.

Finally, the City requests that this Court find that the Defendants have triggered the indemnity provisions of the franchise and therefore owe the City for losses incurred in "[r]esponding to overwhelming numbers of complaints and investigating [Cequel's] failure to comply with the ordinance."  (Doc. # 36 ¶ 44).  Yet again, this requires a finding of breach, which, for the reasons already discussed, has not been adequately alleged.

The Court therefore finds that the Complaint fails to state a claim against Cequel because it fails to allege breach.  Even if the issue of breach was conclusively determined by the City's own proceedings, that decision is not entitled to deference here.  All claims against Cequel will therefore be **dismissed**.

### C.    Dismissal

At the end of their Response to the Motion to Dismiss, the City states that, if this Court does find a defect in the Complaint, "and that defect is curable, then Plaintiff respectfully requests leave to amend, which leave should be freely given when justice requires."  (Doc. # 39 at 11).  While it is true that Rule 15 requires that permission to amend be given "freely," a party must first request leave.  Fed R. Civ. P. 15.  In the Sixth Circuit, that process is a formal motion to amend, and in the absence of such a motion the court presumes that leave to amend has not been requested at all.  *See Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 551-52 (6th Cir. 2008) (upholding the district court's decision not to grant leave to amend when the plaintiff failed to formally move despite being on notice that her complaint was subject to a Rule 12 motion to dismiss); *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002)

("A district court does not abuse its discretion in failing to invite an amended complaint when plaintiff has not moved to amend and submitted a proposed amended pleading."); *Forrester v. Am. Sec. & Prot. Serv. LLC*, 2022 WL 1514905, at *4 (6th Cir. May 13, 2022) ("Forrester never filed a formal motion despite having ample time (over six months) to do so.").

Plaintiff has not formally moved to amend the Complaint, and in the absence of such a motion, the Court will not take up the issue *sua sponte*.

## III.  CONCLUSION

Thus, for the reasons set forth herein, **IT IS ORDERED** that:

(1)  Defendants' Motion to Dismiss (Doc. # 38) is **GRANTED**;

(2)  Plaintiff's Complaint is **DISMISSED**;

(3)  This matter is stricken from the Court's active docket; and

(4)  An accompanying Judgment shall be entered contemporaneously herewith.

This 15th day of August, 2023.



Signed By:

*David L. Bunning*

United States District Judge

K:\DATA\ORDERS\PikeCivil\2022\22-64 Order on MTD.docx